UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROMAN CATHOLIC BISHOP ) | |
| OF SPRINGFIELD, ) | |
|      Plaintiff ) | |
| ) | |
|      v. ) | C.A. No. 10-cv-30033-MAP |
| ) | |
| CITY OF SPRINGFIELD, ) | |
| ET AL., ) | |
|      Defendants ) | |

MEMORANDUM AND ORDER REGARDING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT
(Dkt. Nos. 14 & 22)

January 4, 2011

PONSOR, D.J.

I. INTRODUCTION

This lawsuit places the court at the intersection of two important, protected rights: the right of a religious entity to manage its places of worship in accordance with church law without oversight by secular authorities, and the right of the larger community to have a role in the preservation of a beloved landmark that was once a church. In this case, Plaintiff Roman Catholic Bishop of Springfield challenges, as unenforceable, a local ordinance that might result in the imposition of architectural restrictions on

Our Lady of Hope Church in downtown Springfield,
Massachusetts. Services terminated at Our Lady of Hope in
January 2010, and the ordinance in question, Section
2.46.030(G) of the Revised Ordinances of the City of
Springfield ("the Ordinance"), would require Plaintiff to
submit to oversight by the Springfield Historical Commission
before altering physical aspects of the church building,
possibly including sacred religious iconography.

The complaint sets forth twelve counts alleging, inter
alia, that the Ordinance violates provisions of 42 U.S.C. §
2000cc, the Religious Land Use and Institutionalized Persons
Act ("RLUIPA"), as well as Plaintiff's right to the free
exercise of religion under the United States Constitution
and the Massachusetts Declaration of Rights.

Plaintiff has filed a motion for summary judgment on
all counts, seeking both declaratory and injunctive relief
that would invalidate the Ordinance. Defendants have filed
a cross motion for summary judgment, asking the court to
declare that Plaintiff is obliged to comply with the
Ordinance by filing a timely application with the
Springfield Historical Commission before attempting to alter

or demolish any exterior architectural features of the church.  For the reasons set forth below, Plaintiff's Motion for Summary Judgment (Dkt. No. 14) will be denied, and Defendants' Cross Motion for Summary Judgment (Dkt. No. 22) will be allowed.

It is important to emphasize at the outset that a significant portion of the court's rationale is anchored on the doctrine of ripeness.  The sum and substance of this ruling is this: the Ordinance's requirement that Plaintiff submit a plan for review violates neither statutory nor constitutional law.  If a plan should be formulated and submitted pursuant to the Ordinance, the response of the Historical Commission may change the constitutional picture significantly and entitle Plaintiff to further judicial consideration.

## II. FACTS

A.  The Parties.

Plaintiff Roman Catholic Bishop of Springfield is a corporation sole,[1] the legal entity through which the Roman

---

[1] Unlike a corporation aggregate, which is simultaneously operated by multiple persons, a corporation sole consists of only one person at a time.  However, a

Catholic Diocese of Springfield ("the Diocese") operates.
The Diocese covers the four western counties of
Massachusetts and serves approximately 250,000 Roman
Catholics who reside here.  Plaintiff names as defendants
the City of Springfield ("the City") and, individually,
Mayor Dominic J. Sarno and City Councilors Patrick J.
Markey, William T. Foley, Rosemarie Mazza-Moriarty, Timothy
J. Rooke, Bruce W. Stebbins, Jose Tosado, Kateri Walsh, Bud
L. Williams, and James J. Ferrera, III ("Individual
Defendants").

B.    <u>Closing the Our Lady of Hope Church</u>.

     In 1906, Plaintiff established Our Lady of Hope Parish
in Springfield, Massachusetts.  The parish supported Our
Lady of Hope Church, located, as noted, in downtown
Springfield at the southwest corner of Carew and Armory
Streets.  In 1925, the Our Lady of Hope Church was built; a

---

corporation sole may pass through generations of people,
from one individual to the next, without any disruption to
its legal status.  It has the same rights and obligations as
other corporations.  <u>See</u> 18 Am. Jur. 2d Corporations § 28
(West 2010).

rectory, convent, and school followed within a few years. Our Lady of Hope was the first parish church for the Irish immigrants of the "Hungry Hill" section of the City.

Due to a decline in the number of clergy and parishioners, in October 2004 the Bishop of the Diocese, the Most Reverend Timothy A. McDonnell, initiated an internal study of how best to allocate the Diocese's human and financial resources.  The Bishop formed a committee of clergy and parishioners, known as the Pastoral Planning Committee, to undertake this process.  In August 2009, the Committee submitted to the Bishop its final recommendations, which called for the closing of Our Lady of Hope and for the merger of the parish with St. Mary's East Springfield to form a new parish by the name of St. Mary Mother of Hope. On January 1, 2010, the Bishop adopted these recommendations and ended religious services at Our Lady of Hope.

According to the Canon Law of the Roman Catholic Church, a closed parish may begin the process of deconsecrating church property, in which all materials are

"reduced to profane (non-sacred) use" but not "sordid use."[2]

(Dkt. No. 17, Ex. 3 Bonzagni Aff. ¶ 20.)  The Diocese has

set forth specific procedures for deconsecrating church

property in a manner consistent with Canon Law:

> First, efforts are made to relocate any such
> symbols to other Catholic locations within the
> Diocese of Springfield.  Second, efforts are made
> to relocate such articles to other Catholic
> locations outside the Diocese of Springfield.
> Third, such articles may be removed and placed in
> storage for future use.  Fourth, where religious
> symbols are not deemed proper for storage, Canon
> Law mandates that steps be taken to make certain
> that such sacred symbols are not desecrated or put
> to sordid use.  Simply [put], all such items are
> properly destroyed.

(Dkt. No. 17, Ex. 4 Pomerleau Aff. ¶ 5).  One final

alternative is the sale of church property, which requires

---

[2] This language derives from the Code of Canon Law of
the Roman Catholic Church, which states that "[i]f a church
cannot be used in any way for divine worship and there is no
possibility of repairing it, the diocesan bishop can
relegate it to profane but not sordid use." 1983 Code
c.1222, § 2.  "Profane use" means use for purposes other
than a Roman Catholic worship service, while sordid use
refers to "[t]he denunciation of the Catholic Church and the
Catholic Faith, the desecration of Catholic objects of
devotion and worship or even any disrespectful or casual
treatment of such objects, and/or the proselytizing of
Catholics." Roman Catholic Archbishop of Boston, A
Corporation Sole's Policy on the Sale of Church Buildings,
http://www.bostoncatholic.org/uploadedFiles/BostonCatholicor
g/Parishes_And_People/PolicyonSaleofChurchBuildings0711.pdf
(last visited January 3, 2011).

that either (1) the purchaser agree not to desecrate the property or put it to sordid use; or (2) church officials be permitted to remove all religious symbols from the property. (Id. at ¶ 6.)

Here, the church property at issue takes a variety of shapes, as detailed in the complaint:

1. Our Lady of Hope is a Latin-cross church.

2. The frieze of the portico's architrave is inscribed "IN LOCO ISTO DABO PACEM" ("In this place I will grant you peace").

3. In its tympanum is a cast stone relief of the Madonna and Child attended by Angels.

4. Above the pedimented portico in the gable field of the church is an escutcheon of the Madonna (Mary, the mother of Jesus Christ) a crowned letter "M."

5. Above each entry to the church is an inscription: "PAX INTRANTIBUS" ("Peace to those who enter"), "HAEC ES PORTA DOMINI" ("This is the Gate of the Lord"), and SALUS EXEUNTIBUS ("Blessing to those who leave").

6. Entry to the campanile is beneath an arched opening with cast stone relief of the Apostle and in its tympanum angels flanking the letters "[IHS]," symbolizing the first three letters of the name of Jesus in classical Greek, above a frieze inscribed "HOC EST CORPUS MEUM" ("This is my body").

7. [F]our large stone crosses and sixty-five stain glass windows depicting significant events in

> the life, death and resurrection of Jesus
> Christ.

(Compl. ¶¶ 14, 17.)

It is particularly significant for purposes of this stage of the litigation that Plaintiff's plans for deconsecrating Our Lady of Hope are still in the development phase and have not been finalized.  Whether the ultimate plans would be subject to the Ordinance's strictures, or would be exempted from them, is not, therefore, known at this time.

## C.   The "Our Lady of Hope Historic District".

In late 2009, rumor of Our Lady of Hope's possible closing spread quickly.  Concerned about the fate of the church, some Springfield citizens urged the City to take preemptive action by creating a new historic district encompassing the church.[3]  The Historic Districts Act gives municipalities the power to enact individual ordinances establishing the confines of each historic district.  The

---

[3] In a letter petitioning the Springfield City Council to enact this Ordinance, State Representative Sean Curran described the Church as an "architectural jewel" and noted that "[o]ne does not have to be an expert in historical buildings to know instantly that it would be impossible to build a structure such as Our Lady of Hope today."  (Dkt. No. 26, McCarroll Aff. Ex. 3.)

Act offers several considerations for selecting a historic district:

> the historic and architectural value and significance of the site, building or structure, the general design, arrangement, texture, material and color of the features involved, and the relation of such features to similar features of buildings and structures in the surrounding area.

Mass. Gen. Laws ch. 40C, § 7 (West 2010). The heart of the Act is its provision regarding alterations of a building's architectural design:

> [N]o building or structure within an historic district shall be constructed or altered in any way that affects exterior architectural features unless the commission shall first have issued a certificate of appropriateness, a certificate of non-applicability or a certificate of hardship with respect to such construction or alteration.

Mass. Gen. Laws ch. 40C, § 6 (West 2010). To obtain an approval or exemption, landowners must submit engineering plans and make a presentation to the local historical commission. Currently, there are more than two hundred local historic districts in Massachusetts, and eight exist in the City of Springfield, including the one at issue here.[4]

---

[4] Interestingly, in establishing the "Quadrangle-Mattoon Street Historic District," its first historic district, the City of Springfield expressly exempted

In September 2009, the City's Office of Planning and
Economic Development sent a report to the Springfield
Historical Commission ("the Commission") detailing its
proposal for the "Our Lady of Hope Local Historic District."
The report noted that the Our Lady of Hope Church
"represents the best work of Springfield architect John

---

properties owned by Plaintiff and by the Springfield Library
and Museums Association, Inc. ("the Association").  See
Springfield, Mass., Rev. Ordinances ch. 2.46, § 2.46.030(A).
This exemption was later challenged as being an invalid
application of the Historic Districts Act.  Springfield
Preservation Trust, Inc. v. Springfield Library & Museums
Ass'n, Inc., 852 N.E.2d 83 (Mass. 2006).  Upholding the
provision (Subsection A), the Massachusetts Supreme Judicial
Court determined that the exemption applied only to property
owned by the above-referenced entities in 1972, the date of
the ordinance's enactment.  Id. at 97.

The language used in Subsection A, which declares that
"the authority of [the Springfield Historical] commission
shall . . . be limited so as not to extend to any buildings,
structures or properties however owned or controlled" by
Plaintiff or the Association, is remarkably broad.
Springfield, Mass., Rev. Ordinances ch. 2.46, § 2.46.030(A).
On its face, this provision might be interpreted to create a
blanket restriction on the Commission's authority to
regulate property owned by Plaintiff.  Because Plaintiff
owned the Our Lady of Hope Church well before 1972, an
argument could be made that the exempting provision should
govern the property at issue here.  However, neither
Plaintiff nor Defendants have addressed this possibility in
their briefs.  Their silence suggests that they both
interpret this provision as applying only to the Quadrangle-
Mattoon Street Historic District referenced in Subsection A,
and not to the seven other historic districts established in
Subsections B through H.  The court will therefore pursue
the issue no further.

Donohue" and is "a well-preserved example of the Italian Renaissance design." (Dkt. No. 26, McCarroll Aff. Ex. 4 at 4.) The report also offered a pragmatic reason for its decision: designating the Church a local historic district would allow it "to avoid the same possible fate" as St. Joseph's Church, which was sold to a developer shortly after its closing and was eventually demolished. (Id. at 3.)

On December 14, 2009, the Commission held a public hearing to discuss the possibility of creating a local historic district. Plaintiff's counsel attended this hearing and voiced Plaintiff's opposition to the proposed ordinance.[5] Nonetheless, at the conclusion of the hearing the Commission voted to approve the Ordinance, Section 2.46.030(G) of the Revised Ordinances of the City of Springfield, creating the "Our Lady of Hope Historic District" around the single parcel of land on which the church sits. The Commission then sent its report to Defendant City Councilors, who approved the Ordinance on December 29, 2009. Shortly thereafter, Defendant Mayor

_____

[5] Plaintiff asserts, and Defendants deny, that he was not given proper notice of this hearing. This dispute is not material, and, in any event, it is moot in light of the fact that Plaintiff's counsel appeared at the hearing.

Sarno signed the Ordinance into law.

Rather than file for a certificate of exemption as required by the Ordinance, Plaintiff, instead, filed this lawsuit seeking both declaratory and injunctive relief.

### III. <u>DISCUSSION</u>

The complaint consists of twelve counts, with mirror claims under both state and federal law for violations of the free exercise of religion (Counts One and Two); freedom of speech, expression, and assembly (Counts Three and Four); and equal protection (Counts Five and Six). Count One also includes an Establishment Clause challenge. Count Seven asserts a violation of the Due Process Clause of the Fourteenth Amendment. Counts Eight, Nine, and Ten assert violations of 42 U.S.C. § 2000cc, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). Count Eleven asserts a violation of the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, §11I. Count Twelve does not state a cause of action but rather contains a prayer for relief based on the Massachusetts Declaratory Judgment Act, Mass. Gen. Laws ch. 231(A).

After setting forth the applicable legal standard, the

court will address Defendants' preliminary arguments
concerning ripeness and personal liability, before moving on
to the substance of the complaint.

A.    The Summary Judgment Standard.

It is well established that "when a properly supported
motion for summary judgment is made, the adverse party 'must
set forth specific facts showing that there is a genuine
issue for trial.'" Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).  The
non-movant cannot rest upon mere allegations; rather, it
must set forth "specific, provable facts demonstrating that
there is a triable issue."  See Brennan v. Hendrigan, 888
F.2d 189, 191 (1st Cir. 1989).  See also D. Mass. R. 56.1
(requiring that a non-moving party's opposition to a motion
for summary judgment include "a concise statement of the
material facts of record as to which it is contended that
there exists a genuine issue to be tried, with page
references to affidavits, depositions and other
documentation").

Neither side has pointed to any issue of fact barring
summary judgment; each argues that on the undisputed facts a

favorable ruling on its motion is therefore required as a matter of law.

B.   Ripeness.

As a threshold matter, Defendants argue that Plaintiff's claims are not ripe because Plaintiff never applied to the Springfield Historical Commission for a certificate of exemption.  Plaintiff vigorously responds that the mere enactment of the Ordinance constituted an infringement of its constitutional and statutory rights.  In this posture, the parties' arguments sail past one another like ships in the night.

To better frame the ripeness issue, the court will distill the alleged violations into two temporal facets: (1) violations that arise from the mere enactment of the single-parcel historic district, which only burdens Plaintiff's property and forces Plaintiff to submit to a secular authority; and (2) violations that arise from Plaintiff's resulting inability to deconsecrate church property.  Given this important distinction, the court will bifurcate its analysis of these issues.  See Gilbert v. City of Cambridge, 932 F.2d 51 (1st Cir. 1991) (conducting independent ripeness

14

analysis for each of the claims alleged).

1.    Creation of a Single-Parcel Historic District.

Plaintiff first argues that the mere enactment of the
Ordinance violates its rights.  This argument subdivides
into two separate claims.  First, historic-district status
requires Plaintiff to file for a certificate of exemption
before making changes to the exterior of its church,
resulting in "delay, uncertainty and expense."  (Pl.'s Mem.
Supp. Mot. Summ. J. at 30.)  The court will refer to this as
the "administrative burden" argument.  Second, because the
Ordinance only burdens the Our Lady of Hope Church,
Plaintiff argues that the City has improperly targeted
church property for unfavorable treatment.  For the reasons
set forth below, these two claims are ripe for adjudication
by this court.[6]

The doctrine of ripeness derives from the

_____

[6] Defendants incorrectly label these claims "facial
challenges."  Although Plaintiff's claims purport to attack
the Ordinance itself, the Ordinance merely codifies the
City's determination that the Historic Districts Act applies
to Plaintiff's property.  The Ordinance has no independent
power.  Thus, while Plaintiff's claims appear to challenge
the Ordinance on its face, in fact they represent a
challenge to the Historic Districts Act as applied to
Plaintiff's property.  The court discusses this issue in
greater detail in the text that follows.

constitutional requirement that federal courts hear only "actual cases or controversies," and its basic rationale is to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." <u>Abbott Lab. v. Gardner</u>, 387 U.S. 136, 148-49 (1967).  Whether a case is ripe for adjudication turns on "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration."  <u>Id.</u> at 149.  When determining fitness, "the critical question . . . is whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all."  <u>Ernst & Young v. Depositors Econ. Protection Corp.</u>, 45 F.3d 530, 536 (1st Cir. 1995)(quotation marks and citations omitted).  When determining hardship, the basic rule is that "the greater the hardship, the more apt a court will be to find ripeness."  <u>Id.</u>  These determinations are highly fact-specific.  <u>Id.</u> at 535.

Although both prongs of the test ordinarily must be satisfied in order to establish ripeness, this test is not rigid:

> [T]here may be some sort of sliding scale under
> which, say, a very powerful exhibition of
> immediate hardship might compensate for
> questionable fitness (such as a degree of
> imprecision in the factual circumstances
> surrounding the case), or vice versa.

Id.

Defendants argue that the administrative burden alleged here is both speculative and insignificant, and, therefore, the issue is unfit for adjudication. However, this argument is more properly addressed to the weight of Plaintiff's claim. The Ordinance restricts certain alterations of Plaintiff's property and requires an application and review process, to the exclusion of all other properties in the City not covered by this Act. Plaintiff contends that these restrictions alone constitute violations of state and federal law. Since the requirement to submit to secular authority applies, regardless of whether the City ultimately approves or rejects Plaintiff's application for an exemption, and since this submission to non-church authority is in itself offensive to Plaintiff, this issue is ripe for adjudication.

    2.  <u>Preventing Plaintiff from Deconsecrating its Church</u>.

The second set of claims involves the effect of the Ordinance on Plaintiff's ability to deconsecrate its property.  In its briefs and at oral argument, Plaintiff repeatedly stressed the religious significance of this process, which, at its core, involves the preservation or proper disposition of deeply religious symbols.  Plaintiff argues that the Ordinance prevents it from properly preserving these symbols and potentially distributing them to other churches.  These symbols contain both words and images that convey religious messages sacred to the Catholic Church.  Assuming the Historical Commission rejects Plaintiff's plan (as yet unknown) to dispose of the architectural features that give form to these religious messages, then the effect of the Ordinance would be to permanently "freeze" these sacred messages onto deconsecrated property that could ultimately be put to "sordid" use.  (Pl.'s Mem. Supp. Mot. Summ. J. at 5.)

The difficulty with this argument is that it assumes that the Ordinance, by requiring review by the Historical Commission, will necessarily prohibit whatever plan Plaintiff ultimately adopts to modify the architectural

features of the church.  The Ordinance itself creates no
such inevitability.  The Ordinance, by reference to the
Historic Districts Act, merely prohibits alterations that
"in any way affect[] exterior architectural features <u>unless
the commission shall first have issued a certificate [of
exemption</u>]."  Mass. Gen. Laws ch. 40C, § 6 (West 2010)
(emphasis added).  It is possible that Plaintiff's plan,
once crafted, will be entirely satisfactory to the
Commission; put differently, it is impossible to say that
the plan will be deemed unsatisfactory, since the plan does
not exist and cannot be reviewed.

Recognizing this problem, Plaintiff has argued in its
second opposition brief that filing an application for an
exemption would be futile.  (Dkt. No. 29, Pl.'s Opp'n to
Defs.' Mot. Summ. J. at 7.)  Plaintiff reasons that the
City's decision to pass the Ordinance over its vehement
opposition demonstrates a flat unwillingness to give
consideration to its religious concerns.  Moreover, "the
scope of the exemption which would be needed . . . would
completely undermine the purported justification for the
[Ordinance.]" (<u>Id.</u> at 5.)

These arguments are unpersuasive. As a general rule, a property owner must seek a variance or file an appeal with a local zoning board before filing suit. <u>Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank</u>, 473 U.S. 172 (1985). In <u>Williamson</u>, the Court observed that "it is impossible to determine the extent of the loss or interference until the [government entity] has decided whether it will grant a variance from the application of the regulations." <u>Id.</u> at 191 n.12. It is true that the First Circuit has recognized a narrow "futility" exception to this general rule. <u>Gilbert v. City of Cambridge</u>, 932 F.2d 51, 60-61 (1st Cir. 1991). However, "[t]o come within the exception, a sort of inevitability is required: the prospect of refusal must be certain (or nearly so)." <u>Id.</u> at 61. Additionally, "the filing of one meaningful application will ordinarily be a necessary, although not alone sufficient, precondition for invoking the futility exception." <u>Id.</u>

Plaintiff's failure to file "one meaningful application" puts it in a difficult position: it must prove that the prospect of the City refusing to grant its application for an exemption is certain or nearly certain.

See Gilbert, 932 F.2d at 61.  Plaintiff's arguments do not satisfy this stringent standard.

Contrary to Plaintiff's assertions, nothing in the Ordinance or the Historic Districts Act makes an exemption for Our Lady of Hope Church impossible or even unlikely. The Act allows municipalities to grant the following certificates of exemption:

> (1) a certificate of appropriateness where the proposed alteration is "appropriate for or compatible with the preservation or protection of the historic district;"
>
> (2) a certificate of nonapplicability where the proposed alteration "does not involve any exterior architectural feature, or involves an exterior architectural feature which is [exempted by this Act];" and
>
> (3) a certificate of hardship where, "owing to conditions especially affecting the building or structure involved, but not affecting the historic district generally, failure to approve an application will involve substantial hardship, financial or otherwise, to the applicant."

Mass. Gen. Laws ch. 40C, § 10 (West 2010).  The City might well determine that Plaintiff's circumstances warrant either a certificate of appropriateness or a certificate of hardship.  A certificate of hardship seems like a very real possibility, given that the exemption applies to any

hardship "financial or otherwise," id., and Plaintiff makes a strong argument that the inability to deconsecrate the Church would result in religious hardship.

In short, the City's decision to pass the Ordinance in no way predetermines the outcome of an application for an exemption. Indeed, the Historical Commission's stated reason for proposing the Ordinance was to prevent the outright demolition of the Church. (See Dkt. No. 26, Ex. 4 McCarroll Aff. at 3). It would be perfectly consistent for the City to enact this Ordinance in an effort to stave off the possibility of demolition and later provide an exemption for Plaintiff to remove features of the Church's facade. In any event, the prospect of refusal is far from certain. See Gilbert, 932 F.2d at 61.

In addition, it is not clear that Plaintiff will even need to file for an exemption. At present, Plaintiff has not decided on a specific plan of action that it will take with respect to its religious symbols. In his affidavit, Reverend William Pomerleau discusses several possibilities, one of which is the sale of the Church to a buyer who agrees not to put the symbols to sordid use:

> As a condition of any such sale, an agreement must
> be reached between the Bishop and the purchaser
> that any religious symbols may not be desecrated
> or put to a sordid use.  If such an accommodation
> cannot be reached, all religious symbols are
> removed from the interior and exterior of the
> building.

(Dkt. No. 17, Ex. 4 Pomerleau Aff. ¶ 6).  The court can

conceive myriad potential uses of the deconsecrated church

building that would not require changes to the building's

facade.  With this outcome, the controversy between the

parties would disappear.  Thus, given that Plaintiff's claim

rests on "uncertain and contingent events that may not occur

as anticipated or may not occur at all," Ernst & Young, 45

F.3d at 536, these facets of Plaintiff's claims are not fit

for review at this time.

As to hardship, Plaintiff's attempt to prove a burden

created by the application process itself is weak and

unpersuasive.  See Part D infra.  Moreover, even a showing

of more substantial hardship would not suffice to compel the

court to address issues that are so clearly unfit for

adjudication.  Thus, this claim is not ripe for review.[7]

---

[7] This ruling is consistent with those of other courts
facing similar questions of ripeness in the context of Free
Exercise challenges to landmark ordinances.  See, e.g.,
Metropolitan Baptist Church v. Dist. of Columbia Dep't of

For the sake of clarity, the court emphasizes that this ruling only applies to those claims premised on Plaintiff's inability to deconsecrate its church.  Due to the overlapping nature of Plaintiff's allegations, this ripeness ruling only eliminates Counts Three and Four in their entirety because Plaintiff's freedom-of-speech claims derive solely from its alleged inability to remove religious

_____

Consumer & Regulatory Affairs, 718 A.2d 119, 132 (D.C. 1998) (claim not ripe because the court "cannot say that there is a concrete dispute between the parties in the absence of a decision on a permit application or at least some preliminary step toward that end"); Church of St. Paul & St. Andrew v. Barwick, 496 N.E.2d 183, 190 (N.Y. 1986) (claim not ripe because "the effect [of the landmarks law] cannot be determined until plaintiff has sought and the Commission has granted or denied a certificate of appropriateness").
        Courts facing RLUIPA challenges to other zoning ordinances have reached the same conclusion.  See, e.g., Congregation Anshei Roosevelt v. Planning & Zoning Bd. of Borough of Roosevelt, 338 Fed. Appx. 214, 218-19 (3d Cir. 2009) (RLUIPA claim not ripe where plaintiff failed to file application for a variance and so "the Board has not issued a definitive position as to the extent [plaintiff] can operate on the synagogue property"); Grace Community Church v. Lenox Twp, 544 F.3d 609, 616 (6th Cir. 2008) (RLUIPA claim not ripe where church failed to complete the factual record, explain its position to the commission, or appeal to the board); Murphy v. New Milford Zoning Comm'n, 402 F.3d 342, 350 (2d Cir. 2005) (RLUIPA claim not ripe where city issued cease-and-desist order and plaintiff failed to file for a variance with Zoning Board of Appeals); Taylor Investments, Ltd. v. Upper Darby Twp., 983 F.2d 1285 (3d Cir. 1993) (RLUIPA claim not ripe where plaintiffs' use permit was revoked and plaintiffs did not appeal revocation or seek a variance before filing suit).

messages from its property.  At this point in the
discussion, the remaining counts survive insofar as they are
premised on the Ordinance singling out Plaintiff for
unfavorable treatment and imposing an inappropriate
administrative burden on Plaintiff's religious exercise.

C.    Claims against Individual Defendants.

Individual Defendants correctly argue that Plaintiff's
claims against them are redundant because suits against
municipal agents in their official capacities are actually
suits against the municipality.  See Kentucky v. Graham, 473
U.S. 159, 165-66 (1985).  In its complaint, Plaintiff makes
clear that it is suing the Individual Defendants in their
official capacities, and Plaintiff fails to offer any reason
why this suit should not proceed only against the City
itself.  The court will, therefore, allow Defendants' motion
on all counts as to all Individual Defendants.

D.    RLUIPA.

It is axiomatic that courts should refrain from
addressing constitutional issues when the case may be
resolved by a question of statutory interpretation.  Lyng v.
Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439,

445-46 (1988).  Thus, the court will begin its analysis with Plaintiff's argument under 42 U.S.C. § 2000cc, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), before moving on to the constitutional issues raised.

Plaintiff argues that the Ordinance violates four provisions of RLUIPA: subsection (a), the substantial burden provision; subsection (b)(1), the equal terms provision; subsection (b)(2), the non-discrimination provision; and subsection (b)(3), the unreasonable limitations provision. As the Seventh Circuit notes, "[t]here is some obvious overlap in these statutory provisions . . . [b]ut each of RLUIPA's land-use subsections captures a distinct kind of free-exercise harm and must be given its own force and effect."  River of Life Kingdom Ministries v. Vill. of Hazel Crest, Ill., 611 F.3d 367, 382 (7th Cir. 2010) (en banc). The court, therefore, will address each subsection in turn.

1.   Substantial Burden (Count Nine).

Plaintiff first argues that the Ordinance violates its rights by requiring Plaintiff, a religious institution, to seek approval from secular authorities before making changes to the exterior of its property.  Specifically, the

26

Ordinance requires Plaintiff to seek a certificate of appropriateness, nonapplicability, or hardship that would exempt the proposed activity from the strictures of the Historic Districts Act. Thus, the argument runs, merely including Plaintiff's property within a historic district and thereby forcing it to comply with the application requirement burdens Plaintiff's free exercise of religion.[8]

Subsection (a) of RLUIPA reads as follows:

No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution

(A) is in furtherance of a compelling governmental interest; and

---

[8] To the extent that Plaintiff argues that the mere interaction between government officials and church officials violates the Free Exercise Clause without respect to the burden imposed, Plaintiff's argument is unsupported by the law and confuses Free Exercise jurisprudence with Establishment Clause jurisprudence. Compare Lemon v. Kurtzman, 403 U.S. 602 (1971) (interpreting the Establishment Clause as prohibiting "excessive government entanglement" with religion) with Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531-33 (1993) (explaining that the Free Exercise Clause applies to laws "burdening a particular religious practice" or "targeting religious beliefs"). The complaint does, however, make passing reference to the Establishment Clause, (Compl. ¶ 34), so the court will address this argument in greater detail in Part E.2 infra.

> (B) is the least restrictive means of furthering
> that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1).

The first question is whether the ripe issues before this court involve some "religious exercise" under the meaning of the statute. RLUIPA defines "religious exercise" as follows:

> (A) In general[.] The term "religious exercise"
> includes any exercise of religion, whether or not
> compelled by, or central to, a system of religious
> belief.
>
> (B) Rule[.] The use, building, or conversion of
> real property for the purpose of religious
> exercise shall be considered to be religious
> exercise of the person or entity that uses or
> intends to use the property for that purpose.

42 U.S.C. § 2000cc-5(7). Defendants point that the Our Lady of Hope Church no longer holds religious services. They argue that Plaintiff's proposed actions -- the removal of religious artifacts from church property in preparation for the sale or demolition of the church itself -- is not a "religious exercise." Plaintiff counters that this process, referred to as "deconsecration," is critically important to the Church's religious mission.

Plaintiff has the better argument. RLUIPA broadly

protects "<u>any</u> exercise of religion" and does not require that the practice be central to Plaintiff's system of beliefs. <u>See</u> 42 U.S.C. § 2000cc-5(7)(A) (emphasis added). <u>See also</u> 42 U.S.C. § 2000cc-3(g) ("This chapter shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution."). Certainly, the removal and preservation of, <u>inter alia</u>, crosses and stained glass windows depicting scenes in the life of Jesus Christ, are forms of religious exercise. The fact that these activities are not part of the Church's worship services is irrelevant. Defendants' argument concerns the significance of this religious activity -- an inquiry not permitted by statute. <u>See</u> 42 U.S.C. § 2000cc-5(7)(A). Thus, Plaintiff easily satisfies RLUIPA's first requirement.[9]

Because there is no dispute that the Ordinance imposes a "land use regulation,"[10] the only remaining issue under

_____

[9] The court's ruling on ripeness does not alter this analysis. Although Plaintiff cannot argue at this point that the Ordinance prohibits deconsecration, Plaintiff can and does maintain that the Ordinance causes delay and expense, which impede the process.

[10] Although Defendants initially argued in their brief that the Ordinance was not a land use regulation, they later

this provision is whether "historic district" status creates a "substantial burden" on Plaintiff's free exercise of religion.  This is often the most contentious part of the RLUIPA analysis; RLUIPA does not define the phrase "substantial burden."  However, RLUIPA's legislative history clarifies that a substantial burden "must be established 'by reference to Supreme Court jurisprudence' under the Free Exercise clause of the First Amendment."  Regulating Historic Religious Properties Under RLUIPA, SL014 ALI-ABA at 724 (quoting 146 Cong. Rec. S. 7776 (July 27, 2000)).  The Supreme Court "made clear in other contexts that the 'substantial burden' hurdle is high and that the issue is intensely fact-specific."  Mintz v. Roman Catholic Bishop of Springfield, 424 F. Supp. 2d 309, 319 (D. Mass. 2006) (citing list of cases and holding that city's denial of permit to build parish center substantially burdened diocese's rights).

Although the First Circuit has not yet weighed in, other circuits have issued varying interpretations of this

conceded that 42 U.S.C. § 2000cc-5(5) defines land use regulation as a "zoning or landmarking law . . . that limits or restricts a claimant's use or development of land," which clearly encompasses the present statute.

phrase.  See, e.g., San Jose Christian Coll. v. City of

Morgan Hill, 360 F.3d 1024, 1034-35 (9th Cir. 2004)

(substantial burden is one that "impose[s] a significantly

great restriction or onus upon [religious] exercise);

Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214,

1227 (11th Cir. 2004) (substantial burden is one that

"place[s] more than an inconvenience on religious exercise"

and is "akin to significant pressure which directly coerces

the religious adherent to conform his or her behavior

accordingly"); Civil Liberties for Urban Believers v. City

of Chicago, 342 F.3d 752, 761 (7th Cir. 2003) (substantial

burden is one that renders religious exercise "effectively

impracticable").

        Here, it is unnecessary to decide what constitutes a

"substantial burden" because the burden imposed by complying

with the Historic Districts Act is, on the undisputed facts

of record, de minimis.  Plaintiff alleges that filing for a

certificate of exemption will result in "delay, uncertainty

and expense," (Pl.'s Mem. Supp. Mot. Summ. J. at 30), but

Plaintiff fails to offer any evidence to substantiate that

claim.  In a footnote in its second opposition brief,

Plaintiff asserts that "[t]he application process is not an insignificant one," noting that the process requires the submission of "plans, elevations, specifications, material and other information."  (Dkt. No. 29, Pl.'s Opp'n to Defs.' Mot. Summ. J. at 6 n.1.)  These allegations are vague and conclusory and are insufficient to demonstrate a substantial burden.  The court's "substantial burden" analysis makes understandable the requirement that plaintiffs file "one meaningful application" with a municipal body before filing suit.  See Gilbert v. City of Cambridge, 932 F.2d 51, 60-61 (1st Cir. 1991) ("[T]he filing of one meaningful application will ordinarily be a necessary, although not alone sufficient, precondition for invoking the futility exception.").  If Plaintiff had presented one application, then the record would contain some concrete evidence of the burden imposed. Here, there is no evidence even of discussions.  In these circumstances the court is obliged to conclude that no sufficient evidence of burden has been offered.

Plaintiff invokes a decision from the Washington Supreme Court, First Covenant Church of Seattle v. City of

Seattle, which held that the mere designation of the First Covenant Church of Seattle as a historic landmark imposed administrative and financial hardship on the plaintiff's religious exercise. 840 P.2d 174 (Wash. 1992). First Covenant is easily distinguishable from this case. The Washington court was not tasked with determining whether the administrative burden was substantial, and, in fact, the court never addressed the weight of that burden in isolation. The court instead focused on the fact that the landmark designation "so grossly diminishes the value of the Church's principal asset that it impermissibly burdens First Covenant's right to free exercise of religion," id. at 220, evidence that is nonexistent here.

In any event, this court is not bound by First Covenant, and extensive case law exists to the contrary. For example, in rejecting a religious organization's claim under RLUIPA, the Seventh Circuit held that "the costs, procedural requirements, and inherent political aspects" of the permit approval process were "incidental to any high-density urban land use" and thus "[did] not amount to a substantial burden on religious exercise." Civil Liberties

for Urban Believers v. City of Chicago, 342 F.3d 752, 761 (7th Cir. 2003) ("CLUB"). A district court applied CLUB's holding to a RLUIPA claim in which the plaintiff made the same argument as the one offered here -- that compliance with a permit requirement would result in "delay, uncertainty and expense." Family Life Church v. City of Elgin, 561 F. Supp. 2d 978 (N.D. Ill. 2008). Observing that not all "delays, uncertainties and expenses are substantially burdensome," the court held, "[w]hile surely inconvenient, the eight-month application process [plaintiff] encountered does not rise to the level of a substantial burden." Id.

Other federal courts of appeals have rejected similar claims under RLUIPA as well. See, e.g., Konikov v. Orange County, 410 F.3d 1317, 1323 (11th Cir. 2005) ("[R]equiring applications for variances, special permits, or other relief provisions [does] not offend RLUIPA's goals."); San Jose Christian Coll. v. City of Morgan Hill, 360 F.3d 1024, 1034-35 (9th Cir. 2004) (holding that city's requirement that plaintiff refile a "complete" application for a building permit did not constitute a substantial burden).

Moreover, these outcomes are consistent with RLUIPA's Congressional Record.

> This Act does not provide religious institutions
> with immunity from land use regulation, nor does
> it relieve religious institutions from applying
> for variances, special permits or exceptions,
> hardship approval, or other relief provisions in
> land use regulations, where available without
> discrimination or unfair delay.

146 Cong. Rec. S7774-01, *S7776 (2000) (Joint Statement of Sens. Hatch and Kennedy on the Religious Land Use and Institutionalized Person Act of 2000). Congress's rationale is clear: any contrary interpretation would provide religious groups with <u>carte</u> <u>blanche</u> to pick and choose which zoning requirements to follow. <u>See</u> <u>Petra Presbyterian Church v. Vill. of Northbrook</u>, 489 F.3d 846, 851 (7th Cir. 2007) ("Unless the requirement of substantial burden is taken seriously, the difficulty of proving a compelling governmental interest will free religious organizations from zoning restrictions of any kind."). Certainly, RLUIPA was not intended to grant religious groups such unbounded discretion.

In sum, Plaintiff has not shown that the administrative burden thrust upon it by virtue of its property's inclusion

within a historic district was anything more than an
inconvenience. Because this claim falls far short of the
standard set forth in 42 U.S.C. § 2000cc(a)(1), Defendant's
motion will be allowed as to Count Nine.

2. Equal Terms (Count Eight).

Plaintiff also alleges that the Ordinance infringes on
its rights by targeting property owned by Plaintiff, a
religious institution. Because the Ordinance singles out
Plaintiff's property for disparate treatment, Plaintiff
argues that the Ordinance violates subsection (b)(1) of
RLUIPA, the Equal Terms provision.

Subsection (b)(1) provides that "[n]o government shall
impose or implement a land use regulation in a manner that
treats a religious assembly or institution on less than
equal terms with a nonreligious assembly or institution."
42 U.S.C. § 2000cc(b)(1). The federal courts of appeals
agree that a plaintiff need not establish a substantial
burden to bring a claim under RLUIPA's Equal Terms
provision. See Lighthouse Inst. for Evangelism, Inc. v.
City of Long Branch, 510 F.3d 253, 264 (3d Cir. 2007);
Konikov, 410 F.3d at 1327-29; CLUB, 342 F.3d at 762. The

courts do not agree, however, on how to apply this vague

"equal terms" standard.  The circuit split centers on how

broadly to construe the phrase "nonreligious assembly or

institution" and whether plaintiffs must point to a

similarly situated secular comparator that received more

favorable treatment.[11]

The First Circuit has not as yet taken a position on

these issues, and the facts of this case require none to be

taken here.  Plaintiff presents no evidence of unequal

treatment as compared to <u>any</u> secular comparator, whether

similarly situated or not.  The Ordinance reads as follows:

> There is further established under the provisions
> and in accordance with the Historic Districts Act,
> so-called, as mentioned in this chapter, the Our
> Lady of Hope Historic District, as shown on the

---

[11] <u>Compare</u> <u>Primera Iglesia Bautista Hispana of Boca
Raton, Inc. v. Broward County</u>, 450 F.3d 1295, 1308 (11th
Cir. 2006) (plaintiff must demonstrate unequal treatment as
compared to <u>any</u> secular institution or "assembly," according
to its dictionary definition) (emphasis added) <u>with
Lighthouse Inst. for Evangelism, Inc. v. City of Long
Branch</u>, 510 F.3d 253, 266 (3d Cir. 2007)(plaintiff must
demonstrate unequal treatment as compared to secular
institutions "that are similarly situated as to the
regulatory <u>purpose</u>") (emphasis added) <u>and</u> <u>River of Life
Kingdom Ministries v. Vill. of Hazel Crest, Ill.</u>, 611 F.3d
367, 371 (7th Cir. 2010) (en banc) (plaintiff must
demonstrate unequal treatment as compared to secular
institutions that are similarly situated as to the
"regulatory <u>criteria</u>") (emphasis added).

> map, labeled Exhibit 27-2G, entitled "Our Lady of
> Hope Historic District;" said map to be considered
> part of this chapter.

Springfield, Mass., Rev. Ordinances ch. 2.46, § 2.46.030(G).

The map clearly delineates the boundaries of the district,

which, indeed, encompasses only the Our Lady of Hope Church.

Plaintiff objects to the City's creation of a single-parcel

district that applies only to property owned by a religious

institution, referring to it as a form of discriminatory

"reverse spot zoning." At first glance, this argument has

some appeal. In this case, however, first impressions are

misleading.

Plaintiff's argument mirrors one that the Supreme Court

has flatly rejected, albeit within the context of a Takings

claim.

> It is true . . . that both historic-district
> legislation and zoning laws regulate all
> properties within given physical communities
> whereas landmark laws apply only to selected
> parcels. But, contrary to appellants'
> suggestions, landmark laws are not like
> discriminatory, or 'reverse spot,' zoning: that
> is, a land-use decision which arbitrarily singles
> out a particular parcel for different, less
> favorable treatment than the neighboring ones. In
> contrast to discriminatory zoning, which is the
> antithesis of land-use control as part of some
> comprehensive plan, the New York City law embodies
> a comprehensive plan to preserve structures of

historic or aesthetic interest wherever they might
          be found in the city.

Penn Cent. Transp. Co. v. New York City, 438 U.S. 104, 132

(1978) (holding that the application of New York City's

landmarking law to Grand Central Terminal did not effect an

unconstitutional taking).  See also Rector, Wardens, and

Members of Vestry of St. Bartholomew's Church v. City of New

York, 914 F.2d 348, 355-56 (2nd Cir. 1990) (rejecting

plaintiff's argument that landmark designation violated the

group's Free Exercise rights on same grounds).

     Although Penn Central distinguishes landmarking laws

from historic-district legislation, Defendants have, in

effect, landmarked the Our Lady of Hope Church by creating a

single-parcel historic district.  In fact, the Historic

Districts Act (the "Act") is the functional equivalent of

the landmarking laws that exist in many other states.[12]

There is no question that, by enacting a single-parcel

district, Defendants were acting well within their statutory

grant of authority under this Act.  The Act grants broad

_____

          [12] Massachusetts does have a statute granting the state
secretary the authority to designate historic landmarks, but
this statute, unlike the Historic Districts Act, requires
the owner's consent.  Mass. Gen. Laws ch. 9, § 27 (West
2010).  Thus, the scope of its power is far more limited.

discretion to municipalities to make case-by-case
determinations as to which properties deserve heightened
protection due to their historic value.  See Springfield
Preservation Trust, Inc. v. Springfield Library & Museums
Ass'n, Inc., 852 N.E.2d 83, 93 (Mass. 2006) ("The Act gives
municipalities unfettered discretion whether to establish a
historic district and, if so, what lands, buildings, and
structures to include in that district.").  While in some
cases this process might involve several abutting properties
of similar historic value, in others it will involve only
one structure.  Thus, there is nothing nefarious about a
municipality's decision to apply the Act to a single parcel
of land.  In doing so, the City has recognized that
Plaintiff's property contains unique characteristics that
hold significant social and historical value.

       Plaintiff's argument treats the Ordinance as an
operatively independent statute, which it is not.  Even
First Covenant, a case Plaintiff repeatedly cites in its
briefs, recognizes this point.  See First Covenant Church of
Seattle v. City of Seattle, 840 P.2d 174, 214 (Wash. 1992).
The landmark-designating ordinance at issue in First

<u>Covenant</u> "was passed pursuant to the general [Landmarks] ordinance and is simply the means by which the Landmarks Ordinance is implemented." <u>Id.</u> (citations and quotation marks omitted). For that reason, the court considered the designating ordinance "part of the general act."[13] <u>Id.</u> The same is true here. The Ordinance is simply the means by which the City of Springfield has implemented the Historic Districts Act, and the Ordinance cannot be divorced from that Act. As <u>Penn Central</u> observes, the designation of a historic landmark is part of "a comprehensive plan to preserve structures of historic or aesthetic interest wherever they might be found." <u>Penn Central Transp. Co.</u>, 438 U.S. at 132.

In fact, a designating ordinance merely formalizes an uncontroversial process that occurs in cities across the United States every day, whereby city officials are tasked with determining which properties trigger a particular zoning law and which do not. A designating ordinance

_____

[13] The court then held that the landmark designation ordinance at issue was not neutral with respect to religion because it required an inquiry into whether the proposed actions were motivated by matters of "liturgy." <u>First Covenant Church of Seattle</u>, 840 P.2d at 214. The Ordinance here, however, does not contain any comparable language.

expedites this process by identifying a particular property as conforming or not conforming to an existing zoning scheme.  The Ninth Circuit elaborated on this distinction between ordinances that establish a new zoning law and ones that merely implement an existing scheme:

> An ordinance granting a [conditional use permit] is not a "general zoning ordinance." It affects only the parcel of land that is the subject of the application and has no further force or effect. We agree with the district court that granting or denying a [conditional use permit] constitutes ad hoc administration of the existing zoning ordinance.

Kaahumanu v. County of Maui, 315 F.3d 1215, 1220-21 (9th Cir. 2003).

Historic designation ordinances are no different; they represent ad hoc administration of an existing zoning scheme.  In other words, a designating ordinance simply codifies a city's reasoned decision that a particular property falls under the Historic Districts Act.  The fact that the designating ordinance applies to only one property holds no import.  Therefore, without any evidence of unequal treatment, Plaintiff's claim under 42 U.S.C. § 2000cc(b)(1), Count Eight, fails as a matter of law, and Defendants' motion must be allowed.

### 3.  Non-discrimination Provision (Count Eight).

Plaintiff next argues that the Ordinance violates RLUIPA's nondiscrimination mandate, which states, "No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination." 42 U.S.C. § 2000cc(b)(2). Plaintiff lumps this violation into the same count (Count Eight) as its Equal Terms argument and makes no attempt to distinguish these provisions. Furthermore, the nondiscrimination provision sets a higher bar for plaintiffs by requiring evidence that the government action was motivated by ("on the basis of") religion.

Plaintiff does, at one point, suggest that Defendants yielded to the concerns of disgruntled parishioners, who feared the possibility of the church's demolition, and imposed historic status on the church to appease them. Plaintiff argues "the implications of that conduct . . . may [create] a disputed issue of fact." (Dkt. No 29, Pl.'s Opp'n to Defs.' Mot. Summ. J. at 3.)

This argument is unavailing. First, it is not clear how such considerations demonstrate discriminatory animus.

43

Second, Plaintiff presents no evidence to substantiate its claim that these considerations played a role in the Commission's decision to propose this Ordinance to the City Council. Third, the Commission's report is replete with information justifying its decision based on rational, objective criteria. (<u>See</u> Dkt. No. 26, McCarroll Aff., Ex. 4.) Consequently, there is no genuine issue as to whether Defendants harbored some form of discriminatory animus in passing the Ordinance. <u>See</u> Fed. R. Civ. P. 56(e). Without such evidence, Plaintiff's argument fails, and Defendants' motion will be allowed as to Count Eight.

    4.   <u>Unreasonable Limitations Provision (Count Ten)</u>.

Plaintiff also brings a cause of action under subsection (b)(3)(B) of RLUIPA, which states that "[n]o government shall impose or implement a land use regulation that . . . unreasonably limits religious assemblies, institutions, or structures within a jurisdiction." 42 U.S.C. § 2000cc(b). Plaintiff offers no extended argument regarding subsection (b)(3)(B) in its Memorandum, (Dkt. No. 15, Pl.'s Mot. Summ. J. at 32.), and for good reason: nothing in the Ordinance in any way "limits religious

assemblies, institutions, or structures within a jurisdiction."  Thus, the provision is clearly inapplicable to these facts, and Defendants' motion will be allowed as to Count Ten.

E.    Remaining Federal Claims.

   1.    The Free Exercise Clause of the First Amendment (Count One).

The First Amendment to the United States Constitution prohibits the government from legislating "an establishment of religion or prohibiting the free exercise thereof."  U.S. Const. Amend. I.  The First Amendment applies to states and local governments through the Fourteenth Amendment. Cantwell v. Connecticut, 310 U.S. 296, 303 (1940).

Plaintiff argues that the Ordinance violates the Free Exercise Clause of the First Amendment in two ways.  First, Plaintiff contends that it is not a "neutral law of general applicability" under Employment Div., Dep't of Human Resources v. Smith, 494 U.S. 872, 879 (1990), but rather a system of "individualized assessments," triggering strict scrutiny.  Second, Plaintiff asserts that the Ordinance is an unconstitutional "religious gerrymander."

The following analysis necessarily requires some

overlap with the previous discussion on RLUIPA because, to a
significant extent, RLUIPA merely codifies existing Supreme
Court precedent.  See Midrash Sephardi, Inc. v. Town of
Surfside, 366 F.3d 1214, 1227 (11th Cir. 2004) ("RLUIPA's
equal terms provision codifies [First Amendment]
precedent."); Freedom Baptist Church of Del. Cnty. v. Tp. of
Middletown, 204 F. Supp. 2d 857, 868 (E. D. Pa. 2002) ("What
Congress manifestly has done in [the substantial burden
provision] is to codify the individualized assessments
jurisprudence in Free Exercise cases that originated with
the Supreme Courts decision in Sherbert v. Verner, 374 U.S.
398 (1963)."). Nonetheless, these inquiries are not
identical, so the court will independently examine
Plaintiff's arguments under the First Amendment.

Under the First Amendment's Free Exercise Clause,
courts must apply strict scrutiny to "governmental
classifications based on religion," but not to "neutral laws
of general applicability" that incidentally burden the free
exercise of religion.  Smith, 494 U.S. at 879.  Smith
contrasted "generally applicable" tax laws with laws
containing "a system of individualized exceptions" that

result in "individualized governmental assessment" of the conduct governed.  Id. at 884 (citing Sherbert v. Verner, 374 U.S. 398 (1963)).  Because such laws are not generally applicable, they trigger strict scrutiny.  Id. Additionally, the Court later contrasted truly neutral laws with facially neutral laws that are designed to target religious practice, resulting in an impermissible "religious gerrymander."  Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 535 (1993) (quoting Walz v. Tax Comm'n of New York City, 397 U.S. 664, 696 (1970) (Harlan, J., concurring)).  Similar to individualized assessments, laws creating a "religious gerrymander" require strict scrutiny by the judicial system.  Id.

Plaintiff suggests that the Ordinance is not neutral because it creates a "religious gerrymander" by targeting Plaintiff's property and is not generally applicable because it involves "individualized governmental assessment" of the conduct governed.  Plaintiff urges the court to examine the neutrality of the Ordinance itself, arguing that it is not neutral because it applies only to Plaintiff's property. Plaintiff's arguments are unpersuasive largely for the

reasons discussed above: they misconceive the nature of the Historic Districts Act.  To avoid undue repetition, the court merely notes that the Ordinance represents a finding that Plaintiff's property falls under the strictures of the Historic Districts Act; the Ordinance has no independent power and any imposition on Plaintiff flows from the Act.

To apply Free Exercise precedent, then, the court must look to the Historic Districts Act itself.  The Act sets forth specific criteria for determining which properties it governs.  Unlike in Lukumi, where the statute's criteria subtly (but transparently) targeted religious practice, these criteria are undeniably neutral both in appearance and in substance.  See Mass. Gen. Laws ch. 40C, § 7 (West 2010) (listing criteria such as "the historic and architectural value and significance of the site, building or structure" and "the general design, arrangement, texture, material and color of the features involved").  Plaintiff does not argue to the contrary.

Plaintiff's argument concerning the Ordinance's "general applicability," or lack thereof, presents a more difficult question.  Plaintiff's position is twofold.

First, Plaintiff again mistakenly focuses on the Ordinance
in isolation, arguing that it impermissibly applies only to
Plaintiff's property.  Second, Plaintiff argues that the
Historic Districts Act creates a system of individualized
governmental assessments by allowing the City to grant
certificates of exemption to individual property owners.
This appears to be a plausible interpretation of <u>Smith</u>.  In
fact, other property owners have raised this argument in
Free Exercise challenges to various zoning laws containing
similar exemptions,[14] and a split of authority exists on

---

[14] In assessing RLUIPA claims, several courts have found
that permit and variance applications involve individualized
assessments. <u>See</u> <u>Fortress Bible Church v. Feiner</u>, No. 03-
civ-4235, 2010 WL 3199876, at *88 (S.D.N.Y. Aug. 12, 2010)
(citing lengthy list of cases and reaching same conclusion).
At least three courts have held that landmark laws in
particular create a system of "individualized assessments."
<u>See, e.g.</u>, <u>First Covenant Church of Seattle v. City of
Seattle</u>, 840 P.2d 174, 181 (Wash. 1992); <u>Keeler v. Mayor &
City Council of Cumberland</u>, 940 F. Supp. 879, 885-86 (D. Md.
1996); <u>Episcopal Student Found. v. City of Ann Arbor</u>, 341 F.
Supp. 2d 691, 699 (E.D. Mich. 2004).  <u>But see</u> <u>Rector,
Wardens, and Members of Vestry of St. Bartholomew's Church
v. City of New York</u>, 914 F.2d 348, 354 (2nd Cir. 1990)
(holding that landmark law was neutral law of general
applicability and failing to address issue of individualized
assessments).
    Other courts, however, have backed away from <u>Smith</u>'s
broad language regarding individualized assessments, holding
that some zoning laws involving exemptions and special use
permits are neutral laws of general applicability.  <u>See,
e.g.</u>, <u>Lighthouse Inst. for Evangelism, Inc. v. City of Long</u>

this point.  However, because Plaintiff has failed to file even one application for an exemption, this issue is not ripe for review at this time.  <u>See</u> Part B <u>supra</u>.

In addition, even if Plaintiff succeeded in arguing that the Historic Districts Act was not generally applicable because it creates a system of individualized assessments, Plaintiff would still be left with the problem of demonstrating a substantial burden on its religious exercise.  <u>See</u> <u>Smith</u>, 494 U.S. at 883-84 (discussing <u>Sherbert v. Verner</u>, 374 U.S. 398 (1963)).  As explained above, Plaintiff has presented no evidence that would support such a finding.

   2.   <u>The Establishment Clause of the First Amendment (Count One)</u>.

Plaintiff also alleges that the Ordinance offends the First Amendment's Establishment Clause because it "does not have a secular purpose, its principal or primary effect inhibits freedom of religion, and it fosters an excessive government entanglement with religion."  (Compl. ¶ 34.)  The

---

Branch, 510 F.3d 253, 276-77 (3d Cir. 2007); <u>Grace United Methodist Church v. City of Cheyenne</u>, 451 F.3d 643, 654 (10th Cir. 2006); <u>Civil Liberties for Urban Believers v. City of Chicago</u>, 342 F.3d 752, 761 (7th Cir. 2003).

First Amendment clearly prohibits government from engaging in the "establishment of religion."  U.S. Const. Amend. I. What constitutes an establishment of religion is less clear. The Supreme Court has produced a three-part test to elucidate when government action does not engage in the establishment of religion:

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally the statute must not foster an excessive government entanglement with religion.

Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971) (citations and quotation marks omitted).[15]

Plaintiff has not developed this argument in much detail, and it is clear that no action by Defendant has run afoul of the Establishment Clause.  First, as explained in Part D.3 supra, Plaintiff offers no support for its allegation that Defendants passed the Ordinance with an improper motive.  Second, it is unclear how, if at all, the

---

[15] Although the Supreme Court has raised questions as to Lemon's continuing vitality, the Court has not expressly overruled it, and so it remains binding law.  See Weinbaum v. City of Las Cruces, N.M., 541 F.3d 1017, 1029-31 (10th Cir. 2008) ("Despite scattered signals to the contrary, the touchstone for Establishment Clause analysis remains the tripartite test set out in Lemon.").

Ordinance advances or inhibits religion.  Plaintiff's only
conceivable argument is that denial of a certificate of
exemption would inhibit religion, but that certainly does
not appear to be the Ordinance's "principal or primary
effect."  See Lemon, 403 U.S. at 612.  In any event, that
issue is not ripe for review.  See Part B supra.  Third,
regarding the "excessive entanglement" prong, the only ripe
argument available to Plaintiff is that the mere requirement
to submit a plan for review would transgress Lemon.  Based
on the authorities already cited, this argument, if
accepted, would exempt church property from all zoning
limitations and is simply not sustainable.[16]  Indeed, even
if Plaintiff had gone through the application process and
had been denied, it is unlikely that Plaintiff could show

_____

[16] See, e.g., Cohen v. City of Des Plaines, 8 F.3d 484,
493-94 (7th Cir. 1993) (holding that city's requirement that
religious organization obtain special use permit did not
impermissibly entangle government with religion);
Metropolitan Baptist Church v. Dist. of Columbia Dep't of
Consumer & Regulatory Affairs, 718 A.2d 119, 131 n.15 (D.C.
1998) ("To the extent that the church may be arguing that
the mere inclusion of church property used for religious
purposes within an historic district is per se
unconstitutional, regardless of the actual burden that might
be imposed by such inclusion, that broad proposition has
been rejected in cases with facts considerably more telling
than those here.").

that this entanglement was "excessive."  See generally

Agostini v. Felton, 521 U.S. 203, 233 (1997) (treating

entanglement prong as aspect of effects prong and requiring

plaintiff to show that entanglement advances or inhibits

religion); see also Rector, Wardens, and Members of Vestry

of St. Bartholomew's Church v. City of New York, 914 F.2d

348, 356 n.4 (2d Cir. 1990) (holding that city's decision to

landmark plaintiff's property did not create an

unconstitutional entanglement because "[t]he only scrutiny

of the Church occurred in the proceedings for a certificate

of appropriateness, and the matters scrutinized were

exclusively financial and architectural.").  For these

reasons, Defendants' motion will be allowed as to Count One.

    3.   The Equal Protection Clause of the Fourteenth
          Amendment (Count Five).

     The Equal Protection Clause of the Fourteenth Amendment

commands that no state shall "deny to any person within its

jurisdiction the equal protection of the laws."  U.S. Const.

Amend. XIV.  Because Plaintiff has failed to produce any

evidence of unequal treatment, Defendants' motion will be

allowed as to Count Five.

    4.   The Due Process Clause of the Fourteenth Amendment

(Count Seven).

Plaintiff has not explained how the Ordinance deprives it of life, liberty, or property.  See  U.S. Const. Amend. XIV.  Thus, Defendants' motion will be allowed as to Count Seven.

F.    State Claims

1.    Article 46, Section 1 (Count Two).

Plaintiff also challenges the Ordinance under Article 46, Section 1 of the Amendments to the Massachusetts State Constitution.  While Massachusetts law grants broader protections to Free Exercise plaintiffs than federal law, see Attorney General v. Desilets, 636 N.E.2d 233, 236 (Mass. 1994) (rejecting the Smith standard), here the alleged burden on Plaintiff's religious exercise was minimal and, thus, does not establish a cause of action under state law. Accordingly, Defendants' motion will be allowed as to Count Two.[17]

_____

[17] Plaintiff's claim tiptoes around an unsettled area of state law.  In Society of Jesus of New England v. Boston Landmarks Comm'n, the Massachusetts Supreme Judicial Court declared unconstitutional a statute that designated the interior of a Jesuit church a protected landmark and prevented the plaintiffs from renovating the church's interior.  564 N.E.2d 571, 574 (Mass. 1990).  The court expressly declined to address the issue of exterior

2. <u>Equal Protection (Count Six)</u>.

Because Plaintiff has failed to produce evidence of unequal treatment, Defendants' motion will be allowed as to Count Six.

3. <u>Massachusetts Civil Rights Act (Count Eleven)</u>.

Count Eleven asserts a violation of Mass. Gen. Laws ch. 12, §11I. Because "a municipality is not a 'person' covered by the Massachusetts Civil Rights Act," <u>see</u> <u>Howcroft v. City of Peabody</u>, 51 Mass. App. Ct. 573, 591-92 (2001), and because all claims against the Individual Defendants are dismissed, Defendants' motion will be allowed as to Count Eleven.

4. <u>Massachusetts Declaratory Judgment Act (Count Twelve)</u>.

Count Twelve does not state a cause of action but rather contains a prayer for relief based on the Massachusetts Declaratory Judgment Act. Mass. Gen. Laws ch. 231(A). Thus, Defendants' motion will be allowed as to Count Twelve.

IV. <u>CONCLUSION</u>

--------------------------------

alterations to places of worship. <u>Id.</u> at 572 n.2. Here, Plaintiff's failure to seek an exemption removes this issue from the court's purview.

As noted in the introduction, a mainstay of this analysis is the fact that the case arises in the absence of any submission pursuant to the Ordinance. If such a submission were made, the Historical Commission's response might, or might not, alter the analysis in a future legal challenge. What can be said with certainty now, however, is that no constitutional or statutory rights of Plaintiff have been or are being violated. It is, one hopes, not beyond possibility that wise and respectful discussions might lead to a resolution of the controversy around Our Lady of Hope Church that will be satisfactory to all concerned.

For the foregoing reasons, Defendants' Cross Motion for Summary Judgment (Dkt. No. 22) is hereby ALLOWED in its entirety, and Plaintiff's Motion for Summary Judgment (Dkt. No. 14) is hereby DENIED in its entirety. The clerk will enter judgment for Defendants. This case may now be closed.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge